Filed 5/2/23 P. v. Harris CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CLAY ARTHUR HARRIS,<br><br>Defendant and Appellant. | F083504<br><br>(Super. Ct. No. CR-19-002668)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Stanislaus County. Shawn D. Bessey, Judge.

Charles M. Bonneau, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

In 1992, a jury convicted defendant Clay Arthur Harris of first degree murder (Pen. Code, § 187; count I), attempted second degree robbery (§§ 211, 664; count II), two

counts of second degree robbery occurring on different days (§ 211; counts III, VI), assault with a deadly weapon (§ 245, subd. (a)(1); count IV), and kidnapping (§ 207; count V). (Undesignated statutory references are to the Penal Code.) After the passage of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), defendant filed a section 1172.6 (former § 1170.95)[1] petition for resentencing. The court denied the petition without issuing an order to show cause, concluding defendant was a major participant in the underlying felony who was ineligible for resentencing.

We previously reversed the court's order in an unpublished opinion, concluding the court erred in denying the petition without issuing an order to show cause because the record did not establish defendant was ineligible for resentencing as a matter of law. On remand, the trial court held an evidentiary hearing after which it found defendant was a major participant in the crime who acted with reckless indifference to human life. Accordingly, the trial court denied defendant's petition for resentencing.

Defendant now challenges the denial of his petition, arguing the record does not establish the court applied the correct standard at the evidentiary hearing; the evidence was insufficient to establish he acted with reckless indifference to human life; and the court erred in considering defendant's statements from his parole hearings at the evidentiary hearing.

We affirm the order denying the petition.

## FACTUAL AND PROCEDURAL HISTORY

### *Procedural Background*

In 1992, a jury convicted defendant Clay Arthur Harris of first degree murder during the commission and attempted commission of robbery of Ronald Jorgenson

---

[1]Effective June 30, 2022, the Legislature renumbered then effective section 1170.95 to section 1172.6. (Stats. 2022, ch. 58, § 10.) There were no substantive changes to the statute at that time, although prior changes had been implemented effective January 1, 2022. There is no dispute in this case that turns on any of these changes. For purposes of clarity, we refer to the statute as section 1172.6.

(§ 187; count I), attempted second degree robbery of Ronald Jorgenson (§§ 211, 664; count II), two counts of second degree robbery (§ 211; counts III & VI (of Pete T. & John A., respectively)), assault with a deadly weapon of Pete T. (§ 245, subd. (a); count IV), and kidnapping (§ 207; count V). The jury also found true allegations defendant personally used a deadly and dangerous weapon, to wit, a knife, in violation of section 12022, subdivision (b), during the commission of counts II, III, and VI, and that he used a deadly weapon pursuant to section 1203, subdivision (e)(2) during the assault alleged in count IV. The court sentenced defendant to prison for 25 years to life on the murder count, plus an additional five years for a prior serious felony conviction enhancement (§ 667), and additional determinate terms for the remaining counts.

In 2019, defendant submitted a petition for resentencing pursuant to section 1172.6 using a preprinted form. The court denied defendant's petition without issuing an order to show cause or holding an evidentiary hearing, finding defendant was a major participant in the murder; so, he was not eligible for resentencing.

In the previous appeal, we reversed the court's order denying defendant's petition and remanded with instructions for the trial court to issue an order to show cause and to hold an evidentiary hearing. On remand, the trial court issued an order to show cause.

Before the evidentiary hearing on the petition, the People filed a motion in limine regarding evidence for the evidentiary hearing in which they asked the trial court to take judicial notice of the entire record of conviction, the original appellate opinion (*People v. Harris* (June 3, 1993, F018992) [nonpub. opn.]), and the entire court file pursuant to Evidence Code section 453. They also argued for the admissibility of defendant's Board of Parole Hearing transcripts and documents made in preparation for the hearings, including defendant's written statements, specifically a Board of Parole Hearing Transcript dated May 4, 2016 (portions of which were attached to the People's motion), a Board of Parole Hearing Transcript dated November 7, 2018 (portions of which were attached to the People's motion), undated letters to the victims by defendant, and a

3.

February 9, 2020 Comprehensive Risk Assessment. They argued such documents should be admissible because section 1172.6 provides for the consideration of new evidence, defendant's "statements were voluntary," and the documents "are relevant to and probative of [defendant's] level of involvement in the murder." Additionally, they stated their intention to introduce defendant's Department of Corrections and Rehabilitation records and the exhibits from his trial, which took place on November 16–20, 1992. They noted, at the evidentiary hearing, the court "will be the trier of fact regarding whether [defendant] was a major participant in the robbery and attempted robbery who acted with reckless indifference to human life and whether [defendant] was a direct aider and abettor to the murder."

The court held admissible the transcripts from the May 4, 2016, and November 7, 2018, parole hearings, but it denied admission of the risk assessment. The court also agreed to take judicial notice of the court's file and accepted as part of the record a transcript of an interview between defendant and Detective Richard Ridenour that was admitted in evidence at trial.

### Trial Transcript and Evidence

The evidence at trial including the testimony and defendant's statement to police that was admitted as an exhibit reflect the following facts.

#### John A. Robbery

Around 11:30 p.m. on June 13, 1992, two men, later identified as defendant and Daniel Utter, contacted John A. as he was walking back to his motor home. John A. gave defendant and Utter some change for them to make a phone call, and then he continued toward his motor home. Defendant and Utter followed him. John A. went inside his motor home and, before he could lock the bottom lock, "someone ripped the door off and came in, started fighting with [him]" and got him down.

4.

Both individuals attacked John A. and were fighting him. Defendant[2] held John A. in a chokehold with his arm around John A.'s neck and Utter had John A.'s legs. John A. "almost passed out" when defendant was choking him. Defendant said, "'Quit struggling and I won't hurt you,'" so John A. stopped struggling.

Defendant and Utter then dragged John A. to the back of the motor home. Defendant kept holding John A. in a chokehold and Utter took John A.'s keys. Utter then drove the motor home into a field where he stopped. Defendant held John A. in a chokehold while Utter went through John A.'s pockets and took his wallet and watch. Defendant told John A., "'Don't look at me and don't struggle and you won't be hurt. If you struggle, I'll have to hurt you.'" Defendant and Utter found some rope and tied up John A. and then began "ripping" through the cupboards. Then they drove to an alley, threw a towel over John A.'s head, taped his mouth shut with duct tape, and told him to be quiet. John A. could hear defendant get out of the motor home and negotiate the sale of goods from the motor home, including the TV and some other items, to a man and a woman. Defendant and Utter then drove back to a field and taped John A.'s eyes closed with duct tape. They placed John A. on the floor and tied him to a chair that was bolted to the floor so he could not move. At some point while John A. was tied up, Utter kicked him.

John A. was having a hard time breathing and defendant asked him what was wrong. John A. said he was going to die because he could not breathe, so defendant took off the tape to let John A. breathe and then put the tape back on. As John A. struggled to breathe, Utter told him he was going to hit him on the head with a 1.7-liter bottle of alcohol and knock him out if he was not quiet. At trial, John A. explained he had three knives in the motor home, including a fillet knife and a "Centennial knife"

---

[2]In his testimony, John A. referred to the assailants, who were later identified as defendant and Utter, based on their races—"black" and "white," respectively. We refer to them as defendant and Utter.

5.

commemorating the Statue of Liberty, and both knives were missing after the robbery. At one point during the robbery, defendant took the tape off John A.'s right eye and showed John A. where defendant had cut his hand with a sharp knife; John A. explained the fillet knife was very sharp. Defendant was bleeding and, after the robbery was over, John A. noticed blood on his own shirt. A criminalist testified at trial that the blood on John A.'s shirt could have come from defendant; it could not have come from Utter or John A. The prosecution introduced a picture of a new knife at trial that John A. testified was identical to his fillet knife, which was missing after the robbery.

After defendant put the tape back on John A.'s face, John A. began to struggle. Defendant asked him what was wrong. John A. told him he was going to throw up and "strangle on the vomit." Defendant took the tape off John A.'s mouth and gave him something to throw up into before putting the tape back on. At some point, the motor home stopped and defendant and Utter got out. John A. managed to get loose.

In his statement to police, defendant said Utter talked about burning the motor home and taking John A. to a field someplace far in the country and dropping him off; defendant "didn't want to do" that. When asked if Utter ever said anything about killing John A., defendant responded: "About killing the guy? Ah not as I can _____ [blank in transcript]."

Police recovered various items from the motor home, including a baby food jar that was converted into a "rock pipe" used to smoke rock cocaine, a box with a disposable camera inside, and the shirt John A. was wearing during the incident, which had blood on it that John A. did not believe was his. Latent fingerprints were taken from the motor home, the pipe, and camera. The fingerprint on the camera matched defendant's left thumb. The print taken from the pipe matched one of Utter's fingers.

### Pete T. and Ronald Jorgenson Robbery and Murder

Pete T. and Jorgenson hitchhiked to Modesto on June 17, 1992. They got a beer at an AM/PM convenience store and drank it. It was dark out so they tried to find a

secluded place to wait until daylight when cars would start coming by. They walked down an alley and found a square brick wall enclosure with a dumpster in front of it. They went in, shut the gate, and pulled the dumpster so nobody could find them.

Defendant told Detective Ridenour, when he and Utter initially went into the alley, Utter saw that Pete T. and Jorgenson had luggage. Defendant pushed on the garbage dumpster and asked if anybody was there and someone responded, "yes there is." Defendant and Utter then left. Utter "was hinting to [defendant] that [they] should … see if these guys had any money." Defendant explained they then went "into the thing … [and] I get on the … younger one … I wake up him [*sic*] and I tell him look at me and listen and they [*sic*] won't be any problems just be cool and everything will be fine and we only want money we're not looking for nothing else we're not gonna hurt em." Defendant stated he had a "buck knife."

According to Pete T., he was half asleep when he heard scuffling sounds. He looked up and, the next thing he knew, defendant had a knife to Pete T.'s throat;[3] Pete T. could feel the blade against him. Pete T. thought it was a folding pocket knife. Pete T. testified he "knew the guy[, defendant,] wasn't going to cut [his] throat, didn't seem like that kind of guy anyway." Pete T. could not see what was happening with Jorgenson. He could just hear another person "go[ing] through the stuff"; he did not see the other person. At some point, Utter was looking through their "stuff" and Jorgenson was "not doing anything," so Pete T. asked, "What's the deal here with [Jorgenson]?" Somebody said, "'Your buddy got knocked out.'" Pete T. tried to look twice, and each time defendant hit Pete T. in the face with what "felt like the butt of the knife."

Utter grabbed Pete T.'s wallet while defendant held a knife to Pete T.'s throat. Pete T. testified defendant did not even know Utter took Pete T.'s wallet, however

_____

[3]Pete T. referred to the man with a knife to his throat as "a black guy with a red ski mask on." Because other evidence, including defendant's own statements, identify him as the man who held a knife to Pete T.'s throat, we refer to him as defendant.

7.

defendant told the police defendant took Pete T.'s wallet from the inside of his pants. Pete T. told defendant his "buddy" got Pete T.'s wallet and money, so "just take it and go." Utter continued to search through Pete T.'s and Jorgenson's bags. Pete T. asked defendant to leave him a dollar food stamp and the wallet. Defendant threw the food stamp on Pete T.'s chest and the wallet at his face; then Utter "came over and grabbed the food stamp anyway." When asked if defendant could have cut or stabbed him, Pete T. said he did not think he could and defendant "didn't do much at all."

Defendant told Detective Ridenour he and Utter "took off runnin trying to get rid of [their] clothes." Then they went to find some drugs. He told Detective Ridenour, during the incident, he heard struggling and a scuffle and saw blood on "the guy"; but he did not know Jorgenson had been stabbed until after they left. He heard Jorgenson yell, "ow what the hell is goin on." Defendant denied stabbing anyone or seeing "any kind of stabbing at all."

Defendant admitted to Detective Ridenour that he saw Utter with a knife before the incident happened and that he saw Utter bring a chunk of concrete with him. Defendant assumed Utter hit Jorgenson with the concrete. Defendant reported Utter later told him he thought he "stuck that guy." Defendant explained, Utter "said [Jorgenson] was getting too wild. He couldn't hold him so he just jabbed him with the knife." Defendant said it "scared" him; he denied intending to hurt Jorgenson or Pete T. He stated his only intention was to rob them. At some point later, they returned near the scene, saw a lot of police, and learned Jorgenson had died.

After defendant and Utter left, Pete T. was worried because Jorgenson was not moving. Jorgenson was gagging and making choking sounds. He was whining and all bloody. Pete T. thought Jorgenson had been hit in the head by a rock "because there was a big rock" between Jorgenson's legs. Pete T. went to call the police; it took about five to 10 minutes for them to arrive. The police gave Pete T. a ride back to the scene and, when they arrived, Jorgenson "was standing there bleeding all over the place." The police had

8.

Jorgenson lay down and he passed out before the ambulance arrived. When the ambulance arrived, Pete T. went with Jorgenson to the hospital; Jorgenson died as a result of his injuries. Eventually, Pete T. realized he had also been "stabbed in the butt" and "had a cut across [his] stomach."

Jorgenson's cause of death was an approximately four-inch-deep stab wound to his chest that pierced his heart. Jorgenson also had a "defensive wound" on his left little finger that went "all the way down into the bone." At trial, the prosecution showed the pathologist who conducted the autopsy a picture of the fillet knife resembling the one taken during the John A. robbery. The pathologist testified the knife was consistent with the wound on Jorgenson's chest.

Henry Grays (later referred to as Henry Grace), a friend of defendant's and Utter, picked them up later that morning, after the robbery. Utter had blood on the leg of his pants. Defendant gave Grays a knife. Later that day, Grays learned someone had been killed in an alleyway. Grays called the police to tell them he had a knife that may have been used in the murder. Grays eventually gave the knife defendant had given him to Detective Ridenour and told him "everything" about what he had seen when he gave defendant and Utter a ride.

*Apprehension of Defendant and Utter*

Detective Ridenour met with defendant and Utter the night of June 24, 1992. During the meeting with defendant, Detective Ridenour informed defendant his and Utter's fingerprints were found inside John A.'s motor home. He also told defendant the police had information from the second victim that Utter had killed the other victim and defendant was not the killer.

Defendant provided a lot of detail about both incidents. Detective Ridenour had the conversation again with defendant and recorded it; a recording of the interview was played at trial. A transcript of the recording of defendant's interview with Detective Ridenour was also introduced at the evidentiary hearing on his resentencing petition.

9.

*May 4, 2016, Parole Hearing Transcript*

At the May 4, 2016, parole hearing, the presiding commissioner asked defendant to tell them "in a succinct way what happened before, during and after" the crimes, starting with the June 14, 1992, robbery. Defendant explained, on June 14, 1992, he and an associate, Utter, went to an area of the city, "[t]he purpose of this was to go and find someone that we could possibly rob to get some money [¶] … [¶] so that we can get some drugs." He and his associate followed John A. to his motor home, forced their way in "with violence" because John A. resisted, and they "ended up subduing [John A.], tying him up"; they gagged him and "did duct tape." Defendant admitted both he and Utter "struck the victim with fists, closed fists." They drove the motor home around and took items from it they thought they could sell. They then left the motor home in an abandoned parking lot and left "[John A.] tied up." Defendant responded "Yes" when asked if they sold a few knives, including one that had a gold Statue of Liberty on it.

Defendant testified, on June 18, 1992, he agreed to go with Utter to rob two guys in an alley. Defendant told Utter that he would "get the younger guy" and he told Utter to "get the older guy." They then encountered Pete T. and Jorgenson and defendant held Pete T. at knifepoint and told him, "Don't move and you won't get hurt." Defendant was about three to four feet from Utter. At that time, defendant's back was to Utter, but he could hear rustling as Utter went through Jorgenson's belongings. While defendant's attention was on Pete T., he heard a scuffle but was "not certain to what happened." He testified there was no sound from Jorgenson, no yelling or yelping. Then, Pete T. started squirming, so defendant struck him "in the face with a closed fist."

Utter then came from behind and started to search Pete T.'s "pant area"; at that time, defendant noticed Utter had a knife in his hand. Defendant testified he "didn't trust Mr. Uter [*sic*] at that point in time with the knife because he seemed very unstable. And so I told him if you need to, to take a piece of cement that was in the alley …." According to defendant, Utter did not have the knife "going in"; Utter found the knife, "a

10.

black-handled [fillet] knife," in Jorgenson's property and used it against Jorgenson. Utter found a wallet in Pete T.'s pants that had money and food stamps inside. Defendant gave Pete T. some of the food stamps and then he and Utter took off running to purchase drugs.

Later, defendant and Utter got a ride and were in the car passing the area where they had robbed the men and defendant noticed yellow tape. Defendant asked Utter what happened, and Utter said he stabbed Jorgenson when he was searching through his belongings. Defendant also reported that Utter had stabbed Pete T. in the leg "during the process" of searching for Pete T.'s wallet; defendant did not realize Pete T. was stabbed and believed "it may have been done inadvertently" because Utter was "frantic searching," "in a rush." Defendant gave a man in the car with them the knife defendant had used during the robbery. He and Utter "stayed out of sight" for a few days. Before defendant was arrested, he learned Jorgenson had died.

Defendant stated he has "to take full responsibility" for the crime. He explained, "[H]ad I not agreed to go with Mr. Uter [*sic*] to rob these men, Mr. Jorgenson and [Pete T.] then Mr. Jorgenson would probably still have his life today." Defendant stated he "accept[s] full responsibility for it," "being that I was there I was the one that said, okay let's go do it." Defendant stated it was never his intent to kill somebody. When asked if he acknowledged that "it was his helping" Utter, by holding Pete T. down, that allowed Utter to murder Jorgenson, defendant answered, "Yes, I do."

### November 7, 2018, Parole Hearing Transcript

Defendant explained Utter brought up the idea of robbing Jorgenson and Pete T. Defendant initially disregarded Utter; defendant was feeling emotional regarding some things in his personal life. He later agreed to go with Utter to rob the men "to deaden those emotions" and to get some money.

Defendant had a knife he intended to use during the robbery. He testified, Utter "had questioned me whether or not I had another knife for him. And, I didn't trust

11.

Mr. Uter [*sic*] to have a knife at that time." When asked what he meant, defendant responded, "I thought it was too … unpredictable to have a knife." So, defendant suggested Utter "pick up … a broken piece of concrete, and that he use that if he needed to." Defendant represented that he did not have another knife to give Utter and that he had a buck knife for himself.

Defendant explained, as they approached, he went toward Pete T. because Pete T. was a "larger man" and defendant "was a little larger in stature than [Utter]." He was holding Pete T. at bay with a knife to his chest and throat; his back was to Utter who was searching Jorgenson's property. Defendant and Pete T. heard some scuffling. Pete T. started moving and defendant told him to be still. Pete T. continued to move so defendant "punched him once" and told him that he did not want to hurt him. As defendant held Pete T. "at bay with the knife," Utter began to search "[Pete T.]'s person" and found his wallet. Pete T. asked defendant to leave him something so he could get something to eat, so defendant left him some food stamps from the wallet. Defendant and Utter left with approximately $150 to $160.

Defendant stated the robbery took place at around 4:00 a.m., and he found out later that morning around 7:00 or 8:00 a.m. that Utter had stabbed Jorgenson. He, Utter, and Henry Grace (previously referred to as Henry Grays) were in a car, and defendant saw yellow tape in the area where the robbery occurred. He asked Utter what happened and Utter said he ended up stabbing Jorgenson. Defendant stated he was in "total shock as to why he would do this or why he needed to do this." Defendant denied giving Utter a knife and denied seeing the stabbing occur. He testified, Utter said he found the knife while searching Jorgenson's property. Defendant stated he did not learn Jorgenson died until he was in jail.

### Evidentiary Hearing on Petition for Resentencing

At the hearing on defendant's petition for resentencing, after hearing the parties' arguments, the court noted it read the entirety of the People's exhibit 1 and 1A that

12.

corresponded with the trial transcript. The court did not find defendant was "an aider and abettor in the crime of murder" such that he shared Utter's intent. Instead, the court stated, it was "clear that the theory at the time of trial was felony murder." Accordingly, the court stated its evaluation would strictly be "was he a major participant and did he act in reckless disregard for human life?"

The court stated "out the gate" that it would find defendant was "a major participant in these crimes," noting it did not "even think that's a stretch." The court explained it was clear by defendant's own statements he and Utter had a discussion about the robbery before initiating it, "[a]nd then they return[ed] with a plan." Defendant was "actually involved in the planning." He and Utter left the scene, and then returned armed. They had a discussion regarding which person was going to take on the "younger guy" and who was going to take on the "older guy." There was also evidence defendant admitted Utter "had a knife prior to this event." The court noted there is a statement that defendant indicated "he had sold the fillet knife," "[b]ut the People's evidence circumstantially was the two knives received from [the John A.] robbery and kidnapping that happened a few days prior were the knives involved in this case." The court stated there was "no doubt" defendant "was aware of the intent, the plan, and he admits that they … came back that night to rob the individuals trying to get money." The court further acknowledged "there is the admitted drug issues" for defendant and Utter, "that they were addicted to drugs, and they were trying to obtain money to feed their habits, and that was the intent behind the robbery of these individuals." Accordingly, the court found "[t]here's no doubt he's a major participant in the sense that he planned that."

Regarding defendant's role in supplying or using a lethal weapon, the court noted defendant himself had a lethal weapon—a knife—and he knew Utter had a knife. The court stated there was circumstantial evidence the knife was obtained from the John A. robbery, so "in that sense [defendant] had an active role in supplying the knife or the weapon because there's circumstantial evidence."

13.

Next, the court considered defendant's awareness of the "particular dangerousness posed by the nature of the crime, weapons used, or past experience or conduct of other participants." The court concluded defendant was "well aware" of Utter's propensity for violence. The court considered the robbery and kidnapping of John A., during which both defendant and Utter used violence against John A. The court noted, although no weapons were used, John A. "was hit, battered. He was threatened. He was tied up. He also had tape put over his mouth. They had taped his arms and hands, and obviously a kidnapping." The court also noted it is implied that defendant did not trust Utter with a knife, "so he gave him another deadly or dangerous weapon; to wit, a rock." The court found defendant's "own statements to Detective Ridenour indicated a knowledge that Mr. Utter was dangerous." And defendant admitted "he knew the guy had gotten hit by the cement rock. He saw the blood. He knew that Mr. Utter had that rock. And they were both armed with knives."

The court concluded, there is enough evidence defendant was a principal in the robbery of Pete T. and that he was a principal, aiding and abetting, or had "a very active role in" the robbery of Jorgenson such that he was a "major participant." The court then proceeded to the reckless indifference to human life inquiry.

The court reiterated it had already discussed defendant's knowledge of the weapons and the number of weapons, noting the evidence showed defendant was aware Utter was armed with a knife and a rock, and defendant was armed with a knife. The court further noted defendant was physically present at the scene and "actively involved in the robbery as he was holding a knife to a victim's neck and holding [Pete T.] at bay" while Utter "handle[d]" the older guy who was sleeping. The court stated defendant's actions, including his violent acts, such as hitting Pete T. when he struggled, prevented Pete T. from being able to assist Jorgenson at all during the robbery. The court stated, with regard to the duration of the felony, there was "a significant amount of time" when you look at the events in context, including defendant and Utter leaving the alleyway,

14.

returning armed with weapons, being present, defendant holding Pete T. down long enough for him to hide his wallet, have it retrieved, Jorgenson being hit over the head, scuffling and then getting stabbed. As to whether defendant knew Utter, his coparticipant, was likely to kill, the court concluded there was evidence defendant knew Utter was a dangerous person. The court further found defendant's "conduct at no time minimized the risk of violence"; rather, defendant "actually amplif[ied] it to a point where Mr. Utter was free to use violence because of [defendant's] actions of holding [Pete T.] at bay." The court also considered defendant's conduct following the use of lethal violence: he left the scene immediately, saw the blood on Jorgenson, knew he was injured, did nothing about it, then ditched the clothes that had blood on them, the knife, and his mask. The court further noted defendant had a mask on during the robbery, indicating sophistication and planning prior to the robbery; he was trying to hide his identity.

Based on its evaluation of the evidence, the court stated it found defendant "was a major participant. He participated in the robbery and attempted robbery. And when he acted in that robbery and attempted robbery he acted in reckless disregard for human life and ultimately ended up in the murder of Mr. Jorgenson." Accordingly, the court concluded defendant was not eligible for resentencing under section 1172.6 and denied his petition.

## DISCUSSION

### I.     Senate Bill 1437 and Senate Bill No. 775

On September 30, 2018, the Governor signed Senate Bill 1437, which became effective on January 1, 2019. Senate Bill 1437 "amend[s] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless

15.

indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) It amends section 188, which defines malice, and section 189, which defines the degrees of murder to address felony-murder liability. (Stats. 2018, ch. 1015, §§ 2–3.)

Accordingly, section 188 now provides that, "[e]xcept as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. *Malice shall not be imputed to a person based solely on his or her participation in a crime*." (§ 188, subd. (a)(3), italics added.) The change reflects the Legislature's intent that "[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch. 1015, § 1, subd. (g).)

Additionally, section 189 previously stated, "All murder … which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree." Senate Bill 1437 amended section 189, in part, by adding subdivision (e), which provides:

> "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

The legislation also added section 1172.6, providing a procedure by which defendants whose cases are final can seek retroactive relief if the changes in the law would affect their previously sustained convictions. (Stats. 2018, ch. 1015, § 4.) Initially, section 1172.6 (former § 1170.95) permitted those "convicted of felony murder

16.

or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts …." (Stats. 2018, ch. 1015, § 4, subd. (a).)

In Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775), effective January 1, 2022, the Legislature amended the language of section 1172.6 to expand the scope of the petitioning procedure, in part, by expressly permitting persons convicted of attempted murder under the natural and probable consequences doctrine to petition for relief. (Stats. 2021, ch. 551, § 2.) Under the amended statute, upon receiving a petition, if the petitioner has requested counsel, the court must appoint counsel to represent the petitioner. (§ 1172.6, subd. (b)(3).) If the petitioner has made a prima facie case for relief, the court "shall issue an order to show cause." (*Id.*, subd. (c).) Within 60 days after the order to show cause has issued, the trial court must then hold a hearing "to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1172.6, subd. (d)(1).)

> "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder,

17.

attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

## II. Trial Court Applied the Correct Standard of Review at the Evidentiary Hearing

Defendant first argues the matter must be remanded for a new evidentiary hearing because it is unclear whether the court applied the correct standard of proof in rendering its finding. We conclude the record reflects the court applied the correct standard.

### A. Relevant Procedural History

Before holding the evidentiary hearing, the court expressly stated "we have legal issues as it relates to the burden of proof. But I'm satisfied that the burden of proof is with the People; proof beyond a reasonable doubt that [defendant], one, was a major participant; and two, that he acted in reckless disregard for human life. And I'm going to be sitting as the trier of fact on that and included in that obviously we can consider the trial record. [¶] So I think that's the standard that I'm going to use. And the People concede that fact, [prosecutor]? Did you want to have any other discussion on that?" The prosecutor responded she did not want to have further discussion and agreed the court is to sit as a trier of fact under *People v. Clements* (2021) 60 Cal.App.5th 597,[4] but "it is not a do over of trial." The court agreed it was not a "do over," and the issue was "just whether or not [defendant] was a major participant who acted with reckless indifference to human life during the robbery."

At the hearing, the prosecutor noted the court is to sit "as a trier of fact to decide based on the record of conviction" "that [defendant] would still be convicted of murder

---

[4]The California Supreme Court granted review in *People v. Clements*, *supra*, 60 Cal.App.5th 597 (Dec. 22, 2021, S267624), transferred the matter back to the appellate court for reconsideration in light of the passage of Senate Bill 775, and rendered the appellate court opinion either "depublished" or "not citable."

under the revised Penal Code." The prosecutor argued "[t]he evidence of [defendant]'s role in the crimes is overwhelming and meets the People's burden of proof of proving beyond a reasonable doubt that [defendant] is not entitled to re-sentencing."

## B.  Analysis

Defendant contends, at the time of his evidentiary hearing, there was "citable authority … that a defendant is not entitled to relief if the record of conviction merely contains 'substantial evidence' that the defendant 'could be" found guilty of felony murder beyond a reasonable doubt under current law." He contends Senate Bill 775 clarified and reiterated the "beyond a reasonable doubt" rule for section 1172.6 relief; but, he contends, none of the pleadings or arguments of counsel discussed the pending amendment. He notes, the People's brief in response to the order to show cause noted the split in authority on the question of the necessary finding. Defendant asserts the court noted it was sitting as a "'trier of fact'" and the prosecutor argued defendant "would still be convicted of murder under the revised Penal Code," and the trial court "can find" that he was a major participant acting with reckless indifference to human life. However, he contends, there was "no other assignment of the burden of proof or definition of the standard of proof," and the court "abused its discretion by failing to assign the burden of proof and the standard of proof." He argues, we cannot assume the trial court assigned the burden of proof to the prosecution to prove beyond a reasonable doubt that defendant was guilty of felony murder, and specifically that he acted with reckless disregard for human life. We reject defendant's contention.

While it is true that, at the time of defendant's evidentiary hearing, there was a conflict among the appellate courts regarding the appropriate standard of review and burden of proof, the record here establishes the court applied the correct standard of review and burden of proof. Senate Bill 775 clarified that the burden at the evidentiary hearing is on the People to establish beyond a reasonable doubt that defendant is guilty of

19.

murder under the amended laws. And, here, the court expressly stated it would be applying this standard of proof at the hearing. Thus, we cannot conclude, as defendant contends, the record is unclear about whether the court applied the correct standard of proof at the evidentiary hearing.

## III. The Court Did Not Prejudicially Err in Considering Evidence From Defendant's Parole Hearings

Defendant next contends the court erred in considering the transcripts from defendant's parole hearings at the evidentiary hearing. We conclude any alleged error in the admission of such evidence was harmless.

### A. Relevant Background

Before the evidentiary hearing, the People stated they intended to introduce defendant's statements made at his parole hearings. They asserted "[t]he statute allows for additional evidence to be presented by either party and those were sworn statements that are made on the record at parole hearings." Later, the People filed a motion in limine and a supplemental motion detailing the evidence they sought to introduce at the evidentiary hearing. The People attached excerpts from two different parole hearings— May 4, 2016, and November 7, 2018. Both transcripts reflect defendant was sworn in before he subsequently testified.

The People argued such evidence was admissible as new or additional evidence under section 1172.6, subdivision (d)(3). In support, the People asserted defendant was given an oath at the parole board hearings and he gave sworn testimony about the crimes; the information he gave was relevant, the transcript was certified by a court reporter, and the entire transcript was provided to opposing counsel, and the relevant portion was provided to the court. The People also argued *People v. Myles* (2021) 69 Cal.App.5th 688 (*Myles*) supported the admissibility of the parole hearing transcripts and comprehensive risk assessment. They argued the Fifth Amendment did not apply in this context, and the documents are certified records from a proceeding, and thus not

20.

inadmissible hearsay. They further asserted the statements therein are "directly relevant." With regard to the comprehensive risk assessment, the People argued it contains voluntary statements and is "part of an official record" of defendant's parole hearings. They asserted the assessment was "directly relevant to the issue before the Court, what was [defendant's] role in this murder?" They asserted all the documents were admissible under Evidence Code section 1280 as official records. The People conceded the statements given in the comprehensive risk assessment were "not given under oath during [defendant's] examination by the psychiatrist." But, the prosecutor argued, the assessment contained statements against interest made by defendant.

Defense counsel argued admitting defendant's statements from the parole hearings would violate his constitutional rights and his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. Defense counsel also asserted the statements by the Department of Corrections and Rehabilitation should be excluded as irrelevant, hearsay, lacking foundation, and under Evidence Code section 351.

The court stated it would allow the transcripts from the two parole hearings as additional evidence. However, the court stated it would not allow the risk assessment for "352 reasons" and because an adequate foundation had not been laid "from a record standpoint."

## B.    Analysis

Defendant contends his testimony in the parole hearings was "compelled" and should not have been admitted at the evidentiary hearing on his petition for resentencing. He further asserts use of postconviction statements to a parole or probation official "to prove the nature of the conviction is 'akin to double jeopardy' and would force the defendant to 'relitigate the circumstances of the crime.'" Accordingly, he argues it is prohibited, as discussed in *People v. Trujillo* (2006) 40 Cal.4th 165, 179–180 (*Trujillo*). He contends, the "same considerations affect the admissibility of statements made in a

21.

parole suitability hearing and offered later in an SB 1437 evidentiary hearing." He argues, "[a] decision to inculpate oneself in a parole hearing is not voluntary, because there is strong incentive to (1) testify before the Board, and (2) fully express or even exaggerate one's criminal responsibility in the course of one's testimony." He further contends, the California Supreme Court's decision in *People v. Coleman* (1975) 13 Cal.3d 867 "extended self[-]incrimination protection to prevent the use of postconviction statements in later proceedings." He contends any person in his position who appeared before the state parole board "would reasonably believe that he or she must take responsibility for all aspects of the crime in an effort to demonstrate remorse, and furthermore that statements ma[d]e in that coercive context would not be used later as a means to exclude him or her from SB 1437 relief." Defendant acknowledges several California appellate court decisions have held permissible the use of such prior statements in Senate Bill 1437 proceedings, citing *Myles*, *supra*, 69 Cal.App.5th 688, *People v. Anderson* (2022) 78 Cal.App.5th 81, *People v. Mitchell* (2022) 81 Cal.App.5th 575, and *People v. Duran* (2022) 84 Cal.App.5th 920. However, defendant argues the distinction these cases make "between criminal prosecutions and collateral proceedings which are optional or 'acts of lenity' is untenable." He contends the Fifth and Fourteenth Amendments bar the use of a coerced confession in any context, and "[t]here is no legal or constitutional basis by which coerced or compelled testimony may be introduced in any proceeding." He argues the parole hearing transcripts were prejudicial, so the court's order denying his petition for resentencing should be reversed. We conclude even if the court erred in considering the transcripts, any error was harmless.

In *Myles*, *supra*, 69 Cal.App.5th 688, the appellate court rejected a defendant's challenge to the admission of a parole hearing transcript and parole risk assessment at the evidentiary hearing on her petition for resentencing based on the passage of Senate Bill 1437. Initially, the *Myles* court concluded the defendant had forfeited her challenges to the evidence by failing to object below. The *Myles* court held, irrespective, the proffered

22.

evidence was "new or additional evidence" permitted by the statute and it was not inadmissible under *Trujillo*, *supra*, 40 Cal.4th 165. (*Myles*, *supra*, at p. 703.) About the latter issue, the *Myles* court explained, in *Trujillo*, the California Supreme Court rejected the trial court's consideration of an admission by the defendant in a probation report in determining whether the defendant's prior conviction qualified as a strike. (*Myles*, at p. 703.) The *Myles* court distinguished *Trujillo* on the ground "the probation report at issue [there] potentially would have been used to increase the defendant's punishment"; whereas, "the prosecution in [*Myles*] was not using [the defendant's] postconviction admissions to '"convict"' her, but to prove her ineligibility for a sentence reduction based on changes in the law under a retroactive statutory resentencing procedure." (*Myles*, at pp. 703, 704.) The *Myles* court explained further, "in determining whether a prior conviction qualifies as a strike—the issue under consideration in *Trujillo*—the court is limited to considering the record of conviction" to prevent relitigating the circumstances of the crime, which would threaten the defendant with harm akin to double jeopardy and denial of a speedy trial. (*Myles*, at p. 704.) However, in a section 1172.6 evidentiary hearing, "the trial court is *not* limited to the record of conviction—rather, … the parties may present 'new or additional evidence.'" (*Ibid*.) And "double jeopardy principles are not at stake because defendant is voluntarily seeking to vacate her prior conviction, not subjecting herself to a new trial or the possibility of increased punishment." (*Ibid*.; see *People v. Mitchell*, *supra*, 81 Cal.App.5th at p. 589.)

The *Myles* court also rejected the contention defendant raises here: statements and testimony in connection with suitability for parole should be given "use immunity" pursuant to *People v. Coleman*, *supra*, 13 Cal.3d 867, 889, which held a defendant's statement from a probation revocation proceeding cannot be used against him by the prosecution to lighten its burden of proof at trial. (*Myles*, *supra*, 69 Cal.App.5th at pp. 704–705.) The *Myles* court reasoned, "[b]ecause a sentence modification under section [1172.6] is an act of lenity and not a criminal trial, the wrongful admission of evidence

23.

does not implicate defendant's constitutional rights under the Fifth Amendment." (*Id.* at p. 706; accord, *People v. Mitchell*, *supra*, 81 Cal.App.5th at p. 588 [a petition under § 1172.6 "is the *opposite* of a criminal prosecution," "it can only help the defendant and can never hurt"].) The *Myles* court continued, "[The] defendant was not compelled to file a section [1172.6] petition, nor to testify at her parole hearing, nor to participate in her risk assessment interview." (*Id.* at p. 706.) And it was not "fundamentally unfair" to admit the defendant's testimony and statements from the parole proceedings during the resentencing proceeding, which was "voluntarily initiated by defendant bearing on some of the same issues." (*Ibid.*) The majority in *Mitchell* agreed with the *Myles* court's analysis. (*People v. Mitchell*, *supra*, 81 Cal.App.5th at p. 588 [agreeing with *Myles* that "extending judicially created use immunity to petitioner-initiated collateral proceedings like these is inapt"].) But the *Mitchell* dissent concluded "use of parole board statements as proof against a defendant at a former section 1170.95 evidentiary hearing unquestionably lessens the People's burden of proof" and "is fundamentally unfair." (*Mitchell*, at p. 604 [dis. opn. of Stratton, P. J.].) Finally, the *Myles* court also held, even if the court erred in admitting the parole assessment report and transcript of the parole hearing, the error was harmless under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818; that is, it was not "reasonably probable defendant would have obtained a more favorable outcome had the evidence been excluded." (*Id.* at p. 706.)

We need not decide whether the court erred in considering the parole hearing transcripts because we conclude, even if the court erred, it is not reasonably probable defendant would have obtained a more favorable outcome had the evidence been excluded. (See *Myles*, *supra*, 69 Cal.App.5th at pp. 706–707; *People v. Watson*, *supra*, 46 Cal.2d at p. 836 (*Watson*).) Here, at the evidentiary hearing, the court had the benefit of the trial transcript and defendant's statement to Detective Ridenour that was submitted as an exhibit at trial. This evidence supports the trial court's findings on which its decision to deny defendant's petition was based such that we cannot conclude there is a

reasonable probability defendant would have obtained a more favorable result absent the admission of the parole hearing transcripts.

Specifically, defendant's statement to Detective Ridenour supports the trial court's conclusion that defendant discussed the robbery with Utter before it occurred, and that he was involved in the planning. Defendant told Detective Ridenour, when he and Utter initially went into the alley, Utter saw that Pete T. and Jorgenson had luggage. Defendant pushed on the garbage dumpster and asked if anybody was there and someone responded "yes there is." Defendant and Utter then left. Utter "was hinting to [defendant] that [they] should … see if these guys had any money." Defendant explained they "go into the thing … [and] I get on the … younger one you know I wake up him [*sic*] and I tell him look at me and listen and they won't be any problems just be cool and everything will be fine and we only want money we're not lookin for nuthing else we're not gonna hurt em." Defendant stated he had a "buck knife."

Without consideration of the parole hearing transcript, this evidence supports the court's conclusion it was clear by defendant's own statements that he and Utter had a discussion about the robbery before initiating it, "[a]nd then they return[ed] with a plan." The court also relied on defendant's admission to Detective Ridenour that he saw Utter "had a knife prior to this event." Additionally, the circumstantial evidence introduced at trial was the basis of the court's inference that "the two knives received from [the John A.] robbery and kidnapping that happened a few days prior were the knives involved in this case." Accordingly, the trial evidence, including defendant's statements to Detective Ridenour established defendant had a lethal weapon during the robbery; he had seen Utter with a knife before the robbery; and the knife Utter used during the robbery was the fillet knife obtained during the John A. robbery.

Defendant contends his acceptance of responsibility at the parole hearing—that by restraining Pete T. he made it possible for Utter to fatally stab the victim, his testimony that he told Utter before the robbery of Pete T. and Jorgenson that he would "get the

25.

younger guy" and Utter would "get the older guy," and his statement that he believed Utter was too "unpredictable" to have a knife—were relied upon by the court in denying his petition and, thus, prejudicial. But defendant's role in the crime—that he kept Pete T. at bay with a knife while Utter searched the victims' belongings and ultimately stabbed Jorgenson—was clear from the trial evidence. And whether he accepted responsibility for his role was not a factor of consideration at the resentencing hearing; so, the referenced testimony from the parole hearing transcript cannot be deemed prejudicial. Furthermore, as discussed, the court relied upon defendant's participation in the John A. robbery, of which there was extensive evidence at trial, in concluding defendant was aware of Utter's propensity for violence. And, as discussed, defendant's statement to Detective Ridenour evidenced he and Utter approached the dumpster before the crime, confirmed the victims were there, then they left and returned, and defendant was armed. The court expressly considered these statements in concluding it was clear defendant and Utter had a discussion about the robbery in advance and, circumstantially, they returned with a plan. Accordingly, we cannot conclude absent the admission of defendant's further description of the discussion before the robbery—that defendant would get the younger guy and Utter would get the older guy—it was reasonably probable defendant would have obtained a more favorable outcome. We further note, to the extent defendant explained at the parole hearing he was "shocked" to learn Jorgenson had been stabbed, such evidence could be construed in his favor in that it could support a conclusion he did not anticipate violence or a killing.

For these reasons, we conclude the consideration of the parole hearing transcripts at the evidentiary hearing, if error, was harmless.

## IV.    Sufficient Evidence Supports the Trial Court's Finding

We next conclude sufficient evidence supports both the trial court's findings and its denial of defendant's petition.

26.

### A. Applicable Law

Section 190.2 "identifies the circumstances under which murderers and accomplices can be punished by death or life imprisonment without parole…. For defendants who did not kill and lacked intent to kill, section 190.2, subdivision (d) permits such punishment only if they acted 'with reckless indifference to human life and as a major participant' [in] a qualifying felony like robbery." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7; see *In re Scoggins* (2020) 9 Cal.5th 667, 674 (*Scoggins*).) By incorporating this requirement, section 190.2 codified the holding of *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), bringing California law "into conformity with prevailing Eighth Amendment doctrine." (*In re Ramirez* (2019) 32 Cal.App.5th 384, 393; accord, *People v. Clark* (2016) 63 Cal.4th 522, 609 (*Clark*); *People v. Estrada* (1995) 11 Cal.4th 568, 575; *In re McDowell* (2020) 55 Cal.App.5th 999, 1004.) Section 190.2 thereby requires courts to "examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime." (*People v. Banks* (2015) 61 Cal.4th 788, 801 (*Banks*).)

In *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) the United States Supreme Court held the death penalty could not constitutionally be imposed on a robbery getaway driver who was a minor participant in the crime, was not present when the murder was committed, and had no intent to kill or any culpable mental state. (*Enmund*, *supra*, 458 U.S. at pp. 798, 801; *Scoggins*, *supra*, 9 Cal.5th at p. 675.)

Distinguishing *Enmund*, *Tison* held, the death penalty could be lawfully imposed on two defendants, brothers who helped their father and his cellmate—both convicted murderers—escape from prison. (*Tison*, *supra*, 481 U.S. at pp. 150–152.) The brothers locked up the prison guards and armed the two prisoners during the escape. (*Id.* at p. 139.) A few days later, the group's vehicle got a flat tire. (*Ibid.*) One of the brothers flagged down a passing car for help while the other four armed themselves and laid in

27.

wait by the side of the road. (*Id*. at pp. 139–140.) The group then kidnapped at gunpoint the family of four in the car, robbed them, and drove them into the desert. (*Id*. at p. 140.) The sons stood by while the father and cellmate shot the victims repeatedly. (*Id*. at p. 141.) The perpetrators left the family—which included a toddler and a teenager—to die in the desert, and drove off in the family's car. (*Id*. at pp. 139–141.) *Tison* held the Eighth Amendment does not prohibit imposition of the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life." (481 U.S. at p. 152; see *id.* at pp. 157–158.)

*Enmund* and *Tison* helped define the constitutional limits for punishing accomplices to felony murder and establish a "'spectrum of culpability,'" with felony murderers who "'actually killed, attempted to kill, or intended to kill'" at one end, and minor actors who were not present on the scene and neither intended to kill nor had any culpable mental state at the other. (*Scoggins*, *supra*, 9 Cal.5th at p. 675; accord, *Banks*, *supra*, 61 Cal.4th at pp. 794, 800; *In re Loza* (2017) 10 Cal.App.5th 38, 46.) "Somewhere between them, at conduct less egregious than the Tisons' but more culpable than … Enmund's, lies the constitutional minimum" required for the imposition of a sentence of death or life without the possibility of parole. (*Banks*, at p. 802.) *Tison* and *Enmund* did not establish a ceiling or a floor for determining when an aider and abettor is eligible for such a sentence, however. (*In re Miller* (2017) 14 Cal.App.5th 960, 974, fn. 4; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1014, fn. 4.) The fact a particular defendant appears more culpable than Enmund does not automatically make him death eligible; conversely, neither must a defendant be as culpable as the Tison brothers in order for section 190.2, subdivision (d) to apply. The question is one of degree. (*Miller*, *supra*, at p. 974, fn. 4; *Bennett*, *supra*, at p. 1014, fn. 4.)

In *Banks*, our state Supreme Court clarified the meaning of the "major participant" and "reckless indifference to human life" requirements. *Banks* considered "under what

28.

circumstances an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty." (*Banks*, *supra*, 61 Cal.4th at p. 794.) The court listed various factors that should be considered in making that determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*)

*Banks* found insufficient evidence to show the defendant there—a getaway driver for an armed robbery—was a major participant who acted with reckless indifference. (*Banks*, *supra*, 61 Cal.4th at pp. 804, 808, 811.) No evidence established his role in planning the robbery or procuring the weapons; during the robbery and murder he was absent from the scene, sitting in a car and waiting; and no evidence showed he had any role in instigating the shooting, or could have prevented it. (*Id.* at p. 805.) He was "no more than a getaway driver," like Enmund. (*Ibid.*)

The following year, in *Clark*, the court addressed the "reckless indifference" determination. (*Clark*, *supra*, 63 Cal.4th at pp. 614–623.) Reckless indifference to human life may be "'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' [Citation.]" (*Id.* at p. 616, quoting *Tison*, *supra*, 481 U.S. at p. 157.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, at p. 617.) Reckless indifference to human life has both a subjective and an objective component. (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)

29.

Subjectively, "'the defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.'" (*Ibid.*, quoting *Banks*, *supra*, 61 Cal.4th at p. 801; accord, *Clark*, at p. 617.) Objectively, "'"[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."'" (*Scoggins*, *supra*, at p. 677; accord, *Clark*, at p. 617.) The fact a robbery involved a gun or carried a risk of death is insufficient, by itself, to support a finding of reckless indifference. (*Clark*, at pp. 617–618.)

*Clark*, like *Banks*, listed various factors to be considered when determining whether a defendant acted with reckless indifference: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677 [listing factors set forth in *Clark*, *supra*, 63 Cal.4th at pp. 618–623].)

Based on these factors, *Clark* concluded the defendant there did not act with reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th at p. 623.) The *Clark* defendant was the "mastermind who planned and organized" a computer store robbery and waited across from the store's parking lot when the fatal shooting occurred. (*Id.* at pp. 612, 619.) His plan called for the robbery to take place after the store closed, when there would be fewer people present, for any remaining employees to be handcuffed, and for the use of a single, unloaded gun. (*Id.* at pp. 620–622.) However, during the

attempted robbery the mother of one of the employees—who had come to pick him up from work—entered the store, surprising the robbers, and the defendant's accomplice shot her. (*Id.* at p. 539.) As police cars arrived, the defendant fled the scene, leaving the shooter behind. (*Id.* at p. 537.) *Clark* concluded the defendant—who was not armed, was not physically present in the store when the shooting occurred, did not have the intent to kill, and attempted to minimize the likelihood of violence by timing the robbery for a time when fewer people would be present and the use of an unloaded gun—did not act with reckless indifference to human life. (*Id.* at pp. 611, 618–623; *Scoggins*, *supra*, 9 Cal.5th at p. 676.)

More recently, our Supreme Court considered the reckless indifference inquiry in *Scoggins*, *supra*, 9 Cal.5th 667. *Scoggins* found an insufficient showing of reckless indifference where the defendant planned an unarmed assault and robbery in which one of his accomplices deviated from the contemplated plan and unexpectedly killed the victim. (*Id.* at pp. 671–672.) There, the defendant was swindled by the victim in the purchase of three television sets. (*Id.* at p. 671.) In response, the defendant recruited two close friends to ambush the victim, "'beat the shit'" out of him, and get the defendant's money back, while the defendant waited at a nearby gas station. (*Id.* at pp. 671, 678.) When the victim arrived, one of the friends pulled out a gun and shot him. (*Id.* at p. 672.) In concluding the evidence was insufficient to establish the defendant acted with reckless indifference, the *Scoggins* court considered that he was not present at the scene of the murder, he was not in a position to restrain the shooter, he did not know a gun would be used, he attempted to minimize the risk of death by ordering the assault to occur in a public place in broad daylight, and he acted ambiguously after the shooting. (*Id.* at pp. 677–683.)

After the passage of Senate Bill 1437, section 189, subdivision (e)(3) now provides that a participant in a robbery where a death occurs may be liable for murder if the person was "a major participant in the [robbery] and acted with reckless indifference

31.

to human life, as described in subdivision (d) of Section 190.2." Because the factors articulated by the California Supreme Court in *Banks*, *Clark*, and *Scoggins* construe the language in section 190.2, subdivision (d), which the Legislature incorporated into section 189, subdivision (e), these factors apply when determining a defendant's eligibility for relief under section 1172.6 as a person convicted of felony murder. (See *In re Taylor* (2019) 34 Cal.App.5th 543, 561 ["the standard under section 189, subdivision (e)(3) for holding such a defendant liable for felony murder is the same as the standard for a special circumstance under section 190.2(d), as the former provision expressly incorporates the latter"]; see generally *People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411, 419 ["[t]he language of the special circumstance tracks the language of Senate Bill 1437 and the new felony-murder statutes"].) Thus, we look to these factors in reviewing for substantial evidence a court's finding that a defendant was a major participant who acted with reckless indifference to human life.

## B. Analysis

Defendant contends the record does not support the trial court's finding he acted with "reckless indifference for human life." He argues we review for an abuse of discretion a trial court's decision to grant or deny section 1172.6 relief on a fully developed evidentiary record. The People respond that we should review the trial court's findings for substantial evidence, and they contend the record supports the trial court's conclusions. We agree with the People regarding the appropriate standard of review and conclude substantial evidence supports the trial court's finding defendant was a major participant in the underlying felony who acted with reckless indifference to human life.

### 1. We Review the Court's Findings for Substantial Evidence

First, we address the applicable standard of review, given that this is a point of contention between the parties. Here, whether defendant was ineligible for resentencing hinged on the trial court's factual finding that he was a major participant in the

underlying crime and acted with reckless indifference to human life. And "[f]indings of fact are reviewed under a 'substantial evidence' standard." (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 669, 681 ["'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination"]; see generally *People v. Perez* (2018) 4 Cal.5th 1055, 1066 ["the trial court's eligibility determination, to the extent it was 'based on the evidence found in the record of conviction,' is a factual determination reviewed on appeal for substantial evidence"].) Accordingly, as urged by the People, we review the trial court's determination for substantial evidence. (See *People v. Clements* (2022) 75 Cal.App.5th 276, 298; accord, *People v. Mitchell*, *supra*, 81 Cal.App.5th at p. 591.)

Notably, defendant asserts *People v. Lewis* (2021) 11 Cal.5th 952, *People v. Flint* (2022) 75 Cal.App.5th 607, and *People v. Drayton* (2020) 47 Cal.App.5th 965 support his contention we should review the trial court's findings for an abuse of discretion. However, none of these cases stand for this proposition nor did they apply this standard in reviewing a trial court's findings at the evidentiary hearing. (See *Lewis*, *supra*, at pp. 972–973 [holding, in part, court's failure to appoint defendant counsel upon request after filing of § 1172.6 petition is state law error reviewed for prejudice under *Watson*]; *Flint*, *supra*, at p. 612 [concluding court "exceeded the bounds" for prima facie review of § 1172.6 petition for resentencing by weighing evidence and exercising discretion in a manner forbidden by *Lewis*]; *Drayton*, *supra*, at p. 980 [explaining procedures for assessing whether § 1172.6 petitioner has made prima facie showing of entitlement to relief].) And """"cases are not authority for propositions not considered."""" (*People v. Baker* (2021) 10 Cal.5th 1044, 1109.) Thus, defendant does not persuade us to depart from the "basic principles which govern judicial review of a criminal conviction challenged as lacking evidentiary support"; that is, that we "must review the whole record

in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *People v. Clements*, *supra*, 75 Cal.App.5th at p. 298.)

## 2. *Sufficient Evidence Supports the Court's Findings*

Our inquiry next turns to whether sufficient evidence supports the trial court's conclusion defendant acted with reckless indifference to human life. As discussed, when reviewing the sufficiency of the evidence, "'[o]n appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction.]"'" (*Id.* at p. 508.)

Notably, "factors demonstrating [defendant's] role as a major participant are highly relevant to the analysis of whether he acted with reckless indifference." (*In re Loza*, *supra*, 10 Cal.App.5th at p. 52.) Thus, we begin by considering the evidence that defendant was a major participant in the crime, which is relevant to our inquiry into whether the evidence sufficiently established defendant acted with reckless indifference to human life. We have previously quoted the applicable factors *ante*, at pages 29 and 30 and do not repeat them here.

In this case, the evidence showed defendant was involved in planning the armed robbery. Defendant explained to Detective Ridenour that he and Utter initially approached the dumpster behind which Pete T. and Jorgenson were perched and defendant pushed on it. He and Utter then left and returned. Defendant donned a mask,

34.

armed himself with a knife, and he took on Pete T., who was the larger man, while Utter targeted Jorgenson. Defendant then kept Pete T. at bay as Utter completed the robbery and ultimately stabbed Jorgenson. Defendant supplied his own weapon—a knife—and, though there was conflicting evidence regarding his involvement in obtaining the knife used to murder Jorgenson, defendant admitted to Detective Ridenour he saw Utter with a knife before the robbery and it was undisputed defendant knew Utter was armed with a piece of concrete that he used during the robbery. Furthermore, though there was no evidence defendant knew Utter stabbed Jorgenson during the incident, defendant was present during the entirety of the robbery and stabbing, and he admitted he saw blood on Jorgenson and heard scuffling. He continued to actively participate in the armed robbery despite knowing Jorgenson had been hurt. Indeed, by defendant's own admission, he continued to hold a knife to Pete T.'s throat while Utter completed the robbery. Defendant made no attempt to aid Jorgenson and, by holding a knife to Pete T.'s throat during the incident, defendant's actions also prevented Pete T. from rendering aid to Jorgenson. Defendant also made no effort to restrain Utter when he saw blood and heard scuffling. Rather, he continued to assist Utter in completing the robbery. Once the robbery was complete, defendant fled the scene with Utter and disposed of his clothes. We conclude this record sufficiently established defendant acted as a major participant in the underlying felony. (See *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 [defendant acted as major participant who acted with reckless indifference to human life by instigating robbery, entering home armed, and then using his weapon to keep other victims at bay throughout duration of robbery].)

We next turn to whether there is substantial evidence in the record before us to support the trial court's conclusion defendant acted with reckless indifference to human life. We conclude there is. It is true the California Supreme Court has held participation in an armed robbery and subjective awareness of "the risk of death inherent [in an] armed crime is insufficient" on its own to establish a defendant acted with reckless indifference

35.

to human life. (*Banks*, *supra*, 61 Cal.4th at p. 808.) But, here, the circumstances of the offense paired with defendant's conduct provide substantial evidence to support the trial court's conclusion defendant acted with reckless indifference to human life. For example, defendant was armed with his own knife before approaching Jorgenson and Pete T.; he had seen Utter with a knife before the robbery; and he knew Utter brought a piece of concrete with him when they went to rob the victims. Also, it is undisputed defendant was present during the entirety of the robbery and the stabbing.

Though defendant denied he was aware Jorgenson had been stabbed until after the incident, defendant admitted to Detective Ridenour that he heard scuffling and saw blood on Jorgenson and that he assumed Utter had hit Jorgenson with the concrete. Defendant did nothing to aid Jorgenson; instead, he used his knife to ensure Pete T. did not move, thereby preventing Pete T. from rendering aid to Jorgenson. (See *Clark*, *supra*, 63 Cal.4th at p. 619 [a defendant's "failure to provide aid while present at the scene" may be relevant].) Defendant helped Utter complete the robbery and escape after the stabbing occurred, despite seeing blood on Jorgenson. (See *People v. Medina* (2016) 245 Cal.App.4th 778, 792 [that the defendant "helped [his cohort] escape and had no concern for the shooting victim" supported special circumstance finding]; *People v. Bustos* (1994) 23 Cal.App.4th 1747, 1754 [that the defendant "fled together with his accomplices and the robbery loot, leaving the victim to die" evidenced he was a major participant who acted with reckless indifference to human life]; accord, *Tison*, *supra*, 481 U.S. at pp. 151–152 [the defendants acted with reckless indifference to human life by making no attempt to assist victims before, during or after shooting, but instead choosing to assist killers in their continuing criminal endeavors].) Such evidence supports the trial court's finding defendant acted with reckless indifference to human life.

As, to the duration of the killing, this does not appear to be a killing that occurred after "a long sequence of events." Thus, the duration of the interaction does not necessarily weigh in favor a reckless indifference finding in this case.

36.

However, there was evidence from which the trial court could infer defendant knew Utter had a propensity for violence, which is the fourth *Clark* factor. Though neither "lethal force" nor weapons were used during the John A. robbery, it is undisputed Utter was violent toward John A. during that incident. Indeed, both defendant and Utter attacked John A. and tied him up. Utter was also alleged to have kicked John A. during the incident. Defendant admitted to his involvement in the John A. incident; thus, the trial court could properly infer he had knowledge Utter had a propensity for violence. Defendant expressed his distrust of Utter and described him as "unpredictable," but he also admitted it was his idea Utter take a piece of concrete with him to rob Pete T. and Jorgenson. Additionally, defendant admitted seeing blood on Jorgenson—at which point he could be deemed to be aware of the potential for additional violence—yet he continued to actively participate in the robbery anyway.

Defendant did nothing to minimize the risk of violence during the robbery. To the contrary, he "was willingly involved in the violent manner in which the robbery took place." (*People v. Bascomb*, *supra*, 55 Cal.App.5th at p. 1089 [emphasizing the defendant did not "just watch without intervening as his accomplice accosted the murder victim …, he used his weapon to keep the other victims at bay and thereby actively enabled the murder"].) He used his knife to intimidate Pete T. while Utter completed the robbery, and defendant himself hit Pete T. during the incident. There was also evidence defendant saw Utter take a piece of concrete with him to use during the robbery and he assumed Utter hit Jorgenson with it but defendant did nothing. Additionally, there was no evidence he tried to talk Utter out of committing the robbery or engaging in violence during the crime.

We conclude this record sufficiently supports the trial court's conclusion defendant acted with reckless indifference to human life; that is, defendant was "aware of and willingly involved in the violent manner in which the particular offense [was] committed." (*Banks*, *supra*, 61 Cal.4th at p. 801.) This was not a situation where

defendant was not armed, not present during the killing, or took steps to minimize the risk of violence. Rather, he was "actively involved in every element of the [robbery] and was physically present during the entire sequence of criminal activity culminating in the murder of [Jorgenson] and the subsequent flight." (*Tison*, *supra*, 481 U.S. at p. 158; see *People v. Medina*, *supra*, 245 Cal.App.4th at p. 792.) There was evidence he played a role both in planning and executing the criminal enterprise, he possessed and used a knife, and his prior experience with Utter gave him an awareness of the danger and risk of violence. Thus, viewing the totality of the evidence in the light most favorable to the trial court's judgment, we conclude there was sufficient evidence to support the trial court's denial of defendant's petition for resentencing. (See *Clark*, *supra*, 63 Cal.4th at pp. 622–623.) Put differently, we cannot conclude that """upon no hypothesis whatever is there sufficient substantial evidence to support""" the court's findings. (*People v. Cravens*, *supra*, 53 Cal.4th at p. 508.)

## DISPOSITION

The court's order denying defendant's section 1172.6 petition for resentencing is affirmed.

PEÑA, J.

WE CONCUR:

DETJEN, Acting P. J.

SMITH, J.